UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 18-123 (JNE/BRT) |
| Plaintiff, | |
| v. | |
| Steven Walter Smialek, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

---

Sarah E. Hudleston, Esq., United States Attorney's Office, counsel for Plaintiff.

Douglas L. Micko, Esq., and Katherian D. Roe, Esq., Office of the Federal Defender, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

Defendant Steven Walter Smialek has been charged with a single count of bank robbery in violation of 18 U.S.C. § 2113(a). (Doc. No. 14, Indictment.) He moves to suppress eyewitness identifications (Doc. No. 32); suppress statements (Doc. No. 34); and to suppress evidence obtained as a result of search and seizure (Doc. No. 33). The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

The undersigned held a hearing on Defendant's motions on July 24, 2018, and received testimony from Special Agent Dave Walden and various exhibits in evidence (*see* Doc. No. 49; Doc. No. 51, Ex. List.) The parties submitted post-hearing briefing as

ordered by the Court. (Doc. Nos. 59, 60.) For the reasons set forth below, this Court recommends that Defendant's motions to suppress be denied.

## BACKGROUND[1]

On March 10, 2018, a white male robbed the TCF bank in Fridley, Minnesota. (Tr. 9–10.) The robbery was captured on TCF bank's security camera, which was then released to the media. (Tr. 22.) Upon reviewing the media coverage of still shots from the surveillance footage, an employee of a company that previously employed Defendant Smailek called the Fridley police and reported that he/she believed the person in the footage was Smailek based on his facial features and posture. (Gov't Ex. 1.) The employee provided the police with Defendant's forwarding address and phone number, and the license, make, and model of a vehicle believed to be Defendant's, which officers later confirmed was registered to Defendant Smailek. (*Id.*) Police also later observed the vehicle at the reported address numerous times. (Gov't Ex. 6, at 11–12.)

Sixteen days after the robbery, Fridley police conducted a double-blind photo lineup with the victim bank teller. (Gov't Exs. 1, 2, 3.) A double-blind lineup is one where the officer who shows the photo lineup is unrelated and unaware of the investigation and is unaware of whether the suspect is part of the photo array at the time

---

[1] The following summary is based on Special Agent Dave Walden's testimony provided at the July 24, 2018 hearing, along with the admitted exhibits. SA Walden has worked for the FBI for nineteen years and is the bank robbery coordinator for the FBI in the Minneapolis division. (Doc. No. 57, 7/24/18 Hearing Transcript ("Tr.") 8–9.) As part of his job, he is "knowledgeable and aware of all the bank robberies that occur in [his] division, which includes North and South Dakota and Minnesota," and it is his "job to put similar subjects together both in [his] division and across the country when [they] have traveling bank robbers." (*Id.* at 9.) He is the FBI agent assigned to this case. (*Id.*)

it is provided to the victim. (Tr. 11.) In this case, Detective Perry Jones of the Fridley Police Department created the photo array but had no involvement with showing it to the teller. (*Id.*) Officer[2] Oman assisted as the independent administrator showing the photo array to the victim teller. (Tr. 12.) Officer Oman knew that a bank robbery had occurred and deduced, based on the six photos in the array, that the suspect was a white male; she did not know anything else about the case. (Tr. 45.)

According to SA Walden, the Fridley Police Department utilizes a "Sequential Photo Display Form" when conducting a double-blind photo identification. (Tr. 44; *see* Gov't Ex. 2.) That form states: "You will only see one photo at a time. They are not in any particular order. Take as much time as you need to look at each one. When you are done viewing the photo, the next one will be given to you." (Gov't Ex. 2.) This instruction describes a sequential lineup, which SA Walden testified is "where you show the photos one at a time . . . . You show one photo, they look at it, you take that photo away. You show the next photo in sequence, and so on and so on until your photo array is finished." (Tr. 45–46.) This is different from a comparative photo array, which SA Walden said was "[t]he old way we used to do photo lineups." (Tr. 45.) Using this protocol, the witness would be presented with "six pictures all at the same time, all of them indicated with a number." (*Id.*) The witness would then compare the photos all at once and try to determine the suspect. (Tr. 45–46.) SA Walden believes comparative

---

[2]   At some points in the record Officer Oman is referred to as Detective Oman. For consistency, the Court refers to her throughout this Report and Recommendation as Officer Oman.

photo arrays are no longer used due to judicial criticism. (Tr. 45, 56–57.) SA Walden reviewed the transcript of Officer Oman's photo identification interview with the victim teller and also had a conversation with Officer Oman, and testified that in his interpretation, he believed Officer Oman followed a sequential photograph protocol. (Tr. 46, 49.)

Detective Jones's report of the lineup stated the following, as testified to by SA Walden:

> On 3-26-[18], at the time Detective Oman acted as my independent administrator for a sequential photo lineup administered to the victim teller using double-blind protocols. She read the sequential photo display form. Once this was completed, she was given each photo and an individual file to open and view. The victim teller reviewed all the photos and lineup . . . and indicated it was number 2. She said number 2 stands out because of the shape of his eyes and nose. She said her certainty was about six out of ten being it occurred 16 days ago. The sequential photo display form was completed, which the victim teller signed. The photo lineup was audio recorded.

(Tr. 13; Gov't Ex. 1.) Both Officer Oman and the victim signed the "Sequential Photo Display Form" confirming that Officer Oman did "not know whether the person being investigated [wa]s included," did "not know the order of the photos," and read all the instructions to the victim. (Gov't Ex. 2.) The form also indicated that the victim selected photo number 2 as the robber, based on the face shape, nose, and brow bone. (*Id.*)

Thereafter, in early April 2018, Fridley police detectives showed the TCF video footage to two probation officers who had supervised Defendant previously.[3] (Tr. 10, 62.) According to SA Walden, the probation officers had already been provided context that

---

[3] Defendant had a prior criminal conviction for robbing the same TCF bank.

4

there was an active investigation about a bank robbery and that the officers had made an inquiry for information about Smialek. (Tr. 62–63.) Both probation officers identified Defendant as the robber shown in the TCF video. (*Id.*; *see also* Gov't Ex. 6 at ¶ 16.) One recognized Defendant's facial structure, posture, and gait. (Gov't Ex. 6 at ¶ 16.) The other also recognized Defendant's posture and recognized the jacket the robber was wearing as the same one Defendant had worn in meetings with the officer. (*Id.*) At some point, SA Walden also showed the TCF video footage to one of Defendant's friends, L.R., who had been told that Defendant was a suspect in a bank robbery. (Tr. 59–60.) SA Walden asked L.R. if she recognized the person in the surveillance photo and she identified the person as Defendant. (Tr. 60, 71.)

On April 30, 2018, SA Walden presented affidavits and search warrant applications to the Court for Defendant's apartment, car, and storage area. United States Magistrate Judge Franklin L. Noel signed the search warrants and officers executed them on May 2, 2018.[4] Officers also arrested Defendant on that day.

After the arrest, officers brought Defendant to a jail cell at the Fridley Police Department. When SA Walden first approached Defendant, it appeared that he was resting or asleep. (Tr. 21.) Therefore, SA Walden said something to the effect of "Are you okay? Do you want water?" for the purpose of rousing Defendant awake. (Tr. 22.) SA Walden did not give Defendant *Miranda* warnings at that time. (Tr. 30.) Officers then

---

[4] Officers recovered two items from Defendant's apartment. Per the request of Defendant, the warrant affiliated with the search was introduced into evidence for the Court's "four-corners" review. (*See* Tr. 67, 69; Gov't Ex. 6.)

5

brought Defendant to an interview room to be interviewed by SA Walden and Detective Jones.[5] (Tr. 21–22.) By this time, according to SA Walden, Defendant had been informed "several times" that he had been arrested for a bank robbery and knew he was held on bank robbery charges. (Tr. 24–25.) When Defendant entered the room, he was agitated and began complaining about his arrest and about the fact that he had not been "Mirandized" yet. (Gov't Ex. 5, video recording of Defendant's interview at 7:04–12.) When SA Walden tried to explain the interview process, Defendant continued to interrupt him about not being read his rights and demanding to know when the robbery occurred. (*Id.*) After a few minutes of Defendant's interruptions and questions about when the robbery occurred, SA Walden told Defendant the date and time of the robbery. (7:11–12.) SA Walden testified that he answered Defendant's question hoping that it would calm him down enough to administer *Miranda* rights. (Tr. 41, 76–78.) After being told the date and time of the robbery, Defendant made several comments to the officers. (Gov't Ex. 5, at 7:12–20.) SA Walden then attempted to review *Miranda* rights with Defendant. (Tr. 79.) Defendant read the *Miranda* form and told SA Walden that he understood several of those rights. (*Id.*) Defendant, however, did not complete the FD395 *Miranda* form and would not consent to have a conversation with SA Walden without an attorney present. (Tr. 40.) The interview was thereafter terminated. (Gov't Ex. 5 at 7:21–23.)

Defendant was subsequently indicted for the March 10, 2018 robbery of the TCF bank in Fridley, Minnesota. (Doc. No. 1, 36.)

---

[5]  The attempted interview of Defendant was recorded and was admitted into evidence at the hearing as Government Exhibit 5.

6

## II. ANALYSIS

A. **Defendant's Motion to Suppress Identifications**

    **1. Photographic lineup identification by the victim teller**

To determine whether photographic lineups violate due process, courts utilize a two-step inquiry. *Schawitsch v. Burt*, 491 F.3d 798, 802 (8th Cir. 2007); *United States v. Johnson*, 56 F.3d 947, 953 (8th Cir. 1995). The first step is to determine whether the photo array was impermissibly suggestive. *Schawitsch*, 491 F.3d at 802; *Johnson*, 56 F.3d at 953. If the lineup is not impermissibly suggestive, the inquiry ends and the court does not reach the second step. *United States v. Whitewater*, 879 F.3d 289, 292 (8th Cir. 2018).

If the defendant makes such a showing, the court then looks at the totality of the circumstances to determine whether the photo array creates a substantial risk of misidentification at trial. *Schawitsch*, 491 F.3d at 802; *see also Manson v. Brathwaite*, 432 U.S. 98, 113–16 (1977). When considering the totality of the circumstances, courts consider the following factors: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the degree of attention paid by the witness at the time of the crime; (3) the accuracy of the witness's description prior to the identification; (4) the witness's level of certainty when identifying the defendant; and (5) the length of time between the crime and the identification. *Johnson*, 56 F.3d at 954. Thus, the identification evidence will be admissible at trial unless the totality of circumstances demonstrates that the impermissibly suggestive procedures "created a very substantial likelihood of irreparable

misidentification." *United States v. Gipson*, 383 F.3d 689, 698 (8th Cir. 2004) (citing *Johnson*, 56 F.3d at 953).

Defendant argues that Officer Oman converted the sequential photo lineup with the victim teller into a comparative one, which "became unduly suggestive." (Doc. No. 59, Def.'s Mem. in Supp. of Mots. to Suppress ("Def.'s Mem." 13.) In particular, Defendant points to statements made by the teller stating, "I would say I'm not certain looking at these." (Gov't Ex. 10 at 2.) The teller continues, "I would say two looks most like what I remember but I'm not certain that it would be him." (*Id.*) Defendant argues that by using the words "these" and "looks most like" the robber, it makes clear that the teller is engaging in a comparative analysis. (Doc. No. 59, Def.'s Mem. 5.) Defendant then argues that the lineup became suggestive after the teller stated that she "is really bad at this," (Gov't Ex. 10 at 3), because rather than telling the teller that she need not make an identification, Officer Oman reminded the teller that the photos might not exactly match her memory and told her to "take all the time you need." (Gov't Ex. 10 at 3; Doc. No. 59, Def.'s Mem. 13–14.)[6]

This Court disagrees. First, this Court's understanding, based on the evidence in the record, is that Officer Oman did conduct a sequential photo lineup, not a comparative one. (*See* Tr. 11, 46, 49, 51, 54, 55; Gov't Exs. 2, 10.) The fact that the teller may have

---

[6] Defendant also refers to the insufficiency of the government's evidence, asserting that SA Walden's testimony was not the best evidence on the issue because he was not present at the identification. However, Defendant could have issued subpoenas for the testimony from the other officers who were present.

8

ultimately compared two photos after the sequential photo presentation does not mean that Officer Oman did not follow the sequential photo lineup procedures.

Second, and more importantly, this Court concludes that the photo array was not impermissibly suggestive. There were six photographs in the photo array. All of the photographs were of white men of approximately the same age range. (Gov't Ex. 3.) Three of the men had facial hair, while three of the men did not. (*Id.*) "When there are no differences in appearance tending to isolate the accused's photograph, the identification procedure is not unnecessarily suggestive." *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004). Furthermore, Officer Oman instructed the teller that "[t]he person who was involved in the robbery on 2/10/2018 may be included in those photos." (Gov't Ex. 2.) But Officer Oman did not know Defendant was the suspect and she instructed the teller that she did not know whether the suspect's photo was included in the photo array. (*Id.*) Without more, this double-blind procedure belies any notion that the officer was "cueing" or suggesting to the witness who should be selected. *See Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) (stating that the "preferred double-blind method" eliminates the risk of inadvertently cueing the witness to the suspect).

Because this Court concludes that the photo array was not impermissibly suggestive, it does not continue to the second step of looking at the reliability factors. That said, unless ordered otherwise by the District Court, nothing would preclude defense counsel from cross-examining witnesses on the reliability of the identification at trial.

**2. Identifications by probation officers, a former co-worker, and a friend**

Defendant also argues that the identifications by Defendant's probation officers, a former co-worker, and a friend were all unduly suggestive because when they all viewed the still surveillance images (which was the equivalent to showing a photo of a single suspect), they knew of the investigation, and that Mr. Smialek was a suspect. (Doc. No. 59, Def.'s Mem. 10–11.)

Even if the identification technique used here for these witnesses was unduly suggestive, courts have found that "when someone already familiar with a suspect is asked to comment on whether a recorded voice or image portrays the suspect . . . concerns [about the prejudicial effect of undue suggestiveness] are absent." *United States v. Omar*, 786 F.3d 1104, 1109–10 (8th Cir. 2015) (quoting *United States v. Dobbs*, 449 F.3d 904, 909–10 (8th Cir. 2006)). As in *Dobbs*, the probation officers, former co-worker, and Defendant's friend "were not eyewitnesses being asked to recall their impression of a stranger during a short encounter in the emotionally charged context of an armed robbery." *Dobbs*, 449 F.3d at 909–10. Instead, as acquaintances of the suspect, they are "better equipped than a juror to determine if an image on a tape is, in fact, the image of the known person. This superior ability make[s] such a witness, if deemed credible, a valuable aid to the jury." *Id.* at 910. Here, the probation officers were both familiar with Defendant because they had supervised Defendant; the former co-worker knew Defendant and his appearance from working with him; and the last witness knew Defendant as a friend for a number of years. As such, their identifications of Defendant should not be suppressed.

The Government points out that under Federal Rule of Evidence 701, a witness may testify to identify the Defendant as the person in surveillance photos or video "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Doc. No. 60, Gov't's Resp. 10 (citing *United States v. Anderson*, 783 F.3d 727, 746 (8th Cir. 2015)).) While this premise is true, this Court will not at this stage make any particular evidentiary rulings. Those rulings, and any foundation challenges as to the potential testimony of the probation officers, the former co-worker, and the friend, should be addressed as a pretrial matter with the District Court.[7] Before this Court is a motion to suppress, and this Court concludes the identifications should not be suppressed on constitutional due process grounds.

## B.     Defendant's Motion to Suppress Statements

Defendant argues that any statements that he gave on May 2, 2018, in the interview room with SA Walden and Detective Jones should be suppressed because no *Miranda* rights were given to Defendant prior to the interview. The Government asserts that the statements are admissible because they were spontaneous and not in response to interrogation. In addition, the Government asserts that Defendant waived his *Miranda* rights as to all post-*Miranda* statements.

---

[7]     Defendant also asserts that "the government should not be permitted to present the jury with 'eyewitness' opinion evidence that Mr. Smialek is the robber, when the jury themselves will have an opportunity to observe Mr. Smialek and the same footage shown to the witnesses." (Doc. No. 59, Def.'s Mem. 12.) The question of whether the "eyewitness" evidence would be repetitive or necessary at trial is a question best left for the District Court to consider in a motion in limine.

11

To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning. The warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings need not follow a precise formulation, and the "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* warnings is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. When analyzing whether a particular defendant was in custody at the time of an interrogation, "the ultimate inquiry is simply whether there [was] . . . restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted); *see also United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) ("To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.").

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation." Interrogation refers to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect[.]" *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). *Miranda* rights are not required where there is no interrogation. *E.g.*, *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016). Thus, "[v]oluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *Id.*

Here, it is apparent, and the parties do not dispute, that Defendant was in custody at the time of the May 2, 2018 interview. Instead, the issue before the Court is whether Defendant was subjected to "interrogation" when SA Walden answered Defendant's question about when the robbery took place (i.e., should SA Walden have known that answering Defendant's question would elicit an incriminating response from Defendant).

This issue has been addressed by the Eighth Circuit several times, and the Eighth Circuit has concluded that "[a]n officer's response to a defendant's question does not amount to interrogation." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014); *see also United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008) (stating that responding to defendant's question "does not amount to the functional equivalent of direct questioning" and concluding that the officer's answers to defendant's inquiries are not interrogation); *United States v. Lockett*, 393 F.3d 834, 836–38 (8th Cir. 2005)

13

(concluding that defendant's statements were admissible absent *Miranda* because the officer's comments were "responses to Lockett's own inquiries and thus part of a conversation normally attendant to arrest and custody," not the equivalent of interrogation) (quotations omitted). The Eighth Circuit has also held that when a defendant offered an alibi of another location after an investigating agent told the defendant that he would be asking her about her whereabouts during the date of a bank robbery, the statement made by the defendant was voluntary and admissible. *United States v. Hayes*, 120 F.3d 739, 741, 744 (8th Cir. 1997). The statements made by Defendant after SA Walden told him the date and time of the robbery were voluntarily made by Defendant. And nothing about the present case—including the agitated state of Defendant—convinces this Court that it should conclude differently from these Eighth Circuit cases. Therefore, this Court concludes that SA Walden's response to Defendant's question does not amount to interrogation, and a *Miranda* warning was not required prior to Defendant's subsequent voluntary statements being made for them to be admissible.[8]

## C.     Defendant's Motion to Suppress Evidence – Search Warrant

Defendant requested the Court conduct a "four corners" review of the warrant application associated with the search of the apartment associated with Defendant (*see* Gov't Ex. 6) to determine whether probable cause existed to issue the warrant. In his post-hearing brief filed in support of this motion, Defendant asserts that the information

---

[8]     Because this Court concludes that no interrogation occurred, and therefore no *Miranda* warning was required, this Court does not address the Government's additional argument that Defendant waived his *Miranda* rights. The Court notes, however, that Defendant did not challenge the admissibility of any post-*Miranda* rights statements.

14

suggesting that Defendant resides at Apartment 4 of a particular building in Columbia Heights was stale because it came from a person who had not seen Defendant since 2017 and the resident list for the apartment building referred to in the warrant application was from January 2018. Defendant also asserts there is not a sufficient nexus between the place to be searched and Defendant, pointing out that the observations referred to in the application of Defendant at the address are undated, which is important to the probable cause determination because eight weeks had passed between the robbery and the warrant application.

Under the Fourth Amendment, a search warrant must be supported by a showing of probable cause, which exists when the supporting affidavit "sets forth sufficient facts to establish a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Darr*, 661 F.3d 375, 380 (8th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "When the magistrate relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quotations omitted). The "requisite nexus" between the place to be searched and the evidence sought "is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *Id.* at 657. The task of a judge issuing a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," such a fair probability exists. *Gates*, 462 U.S. at 238. As

a reviewing court, this Court defers "to the probable cause determinations of the issuing judge" unless the judge lacked "a substantial basis for concluding that probable cause existed." *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004).

Probable cause must exist at the time the search warrant issued. *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995), *cert. denied*, 516 U.S. 871 (1995). "While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, there is no bright-line test for determining when information is stale." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (quotations and alterations omitted). "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered." *Id.* (quotations omitted).

Here, United States Magistrate Judge Franklin L. Noel had a sufficient basis for concluding that there was probable cause to believe that evidence of the robbery would be found at Defendant's residence,[9] and the information linking Defendant to the

---

[9] The items listed in Attachment B to the search warrant application to be seized were items that would be considered evidence of the robbery and were items likely to be found in a residence. The items listed to be seized were:

Items and clothing consistent with attire worn or items described as being in the possession of the bank robber in the robbery described in the Affidavit of David T. Walden, including but not limited to:

1. Wire rimmed sunglasses
2. Brown winter knit cap
3. Large tan winter coat

(Footnote Continued on Next Page)

residence identified to be searched was not stale. Special Agent Walden states in his affidavit in support of the search warrant that after March 10, 2018 (the day of the robbery), law enforcement received a tip from Defendant's former co-worker.[10] The co-worker identified Defendant from still photos derived from the bank's digital surveillance system of the robbery, described a vehicle that the company gave Defendant while employed and which Defendant kept possession of after the employment ended, and provided Defendant's forwarding address as Apartment 4 at a certain address in Columbia Heights. (Gov't Ex. 6 at ¶ 11.) After receiving this information, officers observed the car described by the former co-worker, which was confirmed registered to Defendant, at this address on numerous occasions on different dates.[11] (Gov't Ex. 6 ¶ 12.) Officers also confirmed with the building owner that Defendant lived in Apartment 4 and

---

(Footnote Continued from Previous Page)
4. Tan pants or cargo pants
5. Two-toned shoes
6. Cellular phone(s) and charger(s)
7. Handheld computer(s) (tablet) or laptop(s)
8. Desktop computer(s)
9. Camera(s)
10. GPS device(s)
11. Bank cash bands/straps
12. Banking till documents (i.e. audit reports, etc.)

(Gov't Ex. 6, Attach. B.)

[10] Special Agent Walden states in the affidavit that Defendant finalized his employment with the company in 2017. (Gov't Ex. 6.)

[11] Officers also reviewed surveillance video from local businesses in proximity to the bank on the date and approximate time of the bank robbery and observed a vehicle that matched this description. (Gov't Ex. 6 at ¶ 14.)

was listed as the resident of Apartment 4. (Gov't Ex. 6 at ¶ 13.) This information was obtained sometime between the day of the robbery and the signing of the search warrant on April 30, 2018, which means that it was obtained within eight weeks of the signing of the search warrant. SA Walden states in his affidavit that "[b]ased on [his] training and experience, it is known that bank robbers use their residence and vehicles to store clothing, bags and other items used in the commission of the crime, as well as illegally obtained cash proceeds or items purchased with illegally obtained proceeds." (Gov't Ex. 6 at ¶ 17.) He states further that "[w]hile some robbers dispose of some of these items immediately, [he] ha[s] also observed that many bank robbers keep such items in their homes and vehicles indefinitely after a robbery, particularly in the case of personal clothing, jackets, and cash proceeds." (*Id.*)

Courts have found that information that is weeks or months old linking illegal behavior to a residence is not stale. *See, e.g.*, *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002) (concluding the magistrate judge could find a fair probability that defendant had evidence of the crime at his home three months after an intercepted transfer when the officer testified that in her experience child pornographers generally retain their pornography for extended periods); *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (finding that the affidavit that referenced controlled purchases occurring "within the last seven months" was not unduly stale). Based on the information in SA Walden's affidavit, this Court concludes that a magistrate judge could find a fair probability that Defendant had evidence of the robbery at his home eight weeks after the

robbery. Therefore, this Court recommends that Defendant's motion to suppress the evidence seized pursuant to the apartment search warrant be denied.[12]

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Eyewitness Identifications (Doc. No. 32) be **DENIED**;

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 33) be **DENIED**; and

3. Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 34) be **DENIED**.

Date: August 30, 2018             *s/ Becky R. Thorson*___
                                                  BECKY R. THORSON
                                                  United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written

---

[12] Even if the search warrant was not supported by probable cause, this Court further concludes that the evidence seized during the execution of that warrant would still be admissible under the good-faith exception to the exclusionary rule. Under *United States v. Leon*, 468 U.S. 897 (1984), evidence obtained pursuant to a search warrant that is later invalidated "will be admitted if it was objectively reasonable for the officer executing [the] search warrant to have relied in good faith on the [issuing] judge's determination that there was probable cause to issue the warrant." *United States v. Hager*, 710 F.3d 830, 837 (8th Cir. 2013) (quotation omitted).

objections to this Report and Recommendation by **September 13, 2018**. A party may respond to those objections by **September 27, 2018**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.